**IT IS ORDERED as set forth below:**

**Date: October 16, 2024**

_____

**Jeffery W. Cavender**
**U.S. Bankruptcy Court Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| IN RE: | CASE NO. 24-58160 |
|---|---|
| MARLENE EVANS, | CHAPTER 13 |
| Debtor. | |

## MEMORANDUM OPINION AND ORDER

Before the Court are several related motions. First is the Motion to Lift Automatic Stay, Validate Foreclosure Sale and Request for Finding Pursuant to 11 U.S.C. § 362(d)(4)(b) (Doc. No. 14) (the "Motion to Annul") filed by Wilmington Savings Fund Society[1] ("Wilmington"). Wilmington requests that the Court annul the

---

[1] Not in its Individual Capacity but Solely as Owner Trustee of the Aspen Holdings Trust, a Delaware Statutory Trust, by Statebridge Company, LLC.

automatic stay pursuant to § 362(d)(1),[2] validate a foreclosure sale that took place about an hour and a half after Marlene Evans ("Debtor") filed this bankruptcy case, and find that this case was filed as part of a scheme to delay, hinder, and/or defraud Wilmington as contemplated by 11 U.S.C. § 362(d)(4). Debtor opposes the Motion to Annul and filed an initial Response to the Motion to Annul (Doc. No. 29) ("Debtor's Response") and an Addendum to Debtor's Response (Doc. No. 36) ("Debtor's Addendum").

Next is the Motion to Dismiss Case for Failure to Comply with 11 U.S.C. § 109(h) and 11 U.S.C. § 521(b) (Doc. No. 17) (the "Motion to Dismiss") filed by Nancy J. Whaley, Standing Chapter 13 Trustee ("Trustee"). Trustee requests dismissal of Debtor's bankruptcy case because Debtor failed to obtain credit counseling prior to filing, rendering her ineligible to be a debtor pursuant to § 109(h). Debtor filed a Response to the Motion to Dismiss (Doc. No. 25).

Both the Motion to Annul and the Motion to Dismiss were scheduled for a hearing on September 10, 2024 (the "Hearing"). The day before the Hearing, Wilmington filed a Memorandum in Support of the Motion to Annul (Doc. No. 35) (the "Memorandum"). The morning of the Hearing, Debtor filed a motion to reset the Hearing to allow her time to respond to the Memorandum (Doc. No. 37) (the "Motion to Continue"). The Court held the Hearing as scheduled and orally denied the Motion

---

[2] Unless otherwise indicated, all statutory citations are to Title 11 of the United States Code (the "Bankruptcy Code").

to Continue. Debtor, counsel for Wilmington, and counsel for Trustee appeared at the Hearing.

Finally, several days after the Hearing Debtor filed a Motion to Waive Requirement of 11 U.S.C. § 109(h) (Doc. No. 40) (the "Motion to Waive"), in which she argues that Wilmington lacks standing to prosecute cases in Georgia because it has failed to register with the Georgia Secretary of State.

The Court has considered the Motion to Annul, the Motion to Dismiss, the Motion to Waive, the various responses and other papers filed in support or opposition to the motions, the arguments at the Hearing, and the record in this case and Debtor's previous cases in this Court. For the reasons discussed below, the Court will grant the Motion to Annul and the Motion to Dismiss and deny Debtor's Motion to Waive.

## JURISDICTION

The Court has jurisdiction under 28 U.S.C. § 1334, and these are core matters pursuant to 28 U.S.C. § 157(b)(2)(A) and (G).

## FINDINGS OF FACT

### A. The Property, Loan, and Security Deed

Debtor obtained title to real property at 2328 New Haven Place, Conyers, GA 30094 (the "Property") in February, 2006. Debtor obtained a loan August 6, 2006, from Florida Capital Bank, N.A. d/b/a Florida Capital Bank Mortgage ("Florida Capital") in the original principal amount of $344,000 (the "Loan"). The Loan is secured by the Property pursuant to a Deed to Secure Debt to Mortgage Electronic Registration Systems, Inc. as nominee for Florida Capital, which was recorded in the

real estate records of Rockdale County August 30, 2007 (the "Security Deed"). The Security Deed was assigned six times thereafter pursuant to assignments recorded in the Rockdale County real estate records, including a final assignment to Wilmington recorded February 28, 2023. In the discussion that follows, the Court will use the term "Lender" to refer to the holder of the Security Deed at any given time.[3]

Debtor first defaulted on the Loan in 2009. Since then, Debtor has engaged in a long and sustained effort to delay and hinder foreclosure of the Property.

### B. Debtor's Property Filings and State Court Proceedings

Beginning January 31, 2011, Debtor recorded a series of documents in the Rockdale County real estate records in an attempt to revoke the right of Lender to conduct a foreclosure on the Property. [Doc. 14-5, Ex. E.] In 2013, Lender filed an action against Debtor in the Rockdale County Superior Court (the "Superior Court") seeking declaratory judgment that the Security Deed was in full force and effect. [Doc. No. 14-4, Ex. D.] The Superior Court granted summary judgment in favor of Lender by order entered February 17, 2015 (the "2015 Order"), ordering that the Security Deed "is valid and in full force and effect and that Marlene L. Evans remains obligated to pay all sums secured by the subject Security Deed." [Doc. 14-5, Ex. E.] The 2015 Order detailed nine "Junk Filings" recorded by Debtor:

- "Revocation of Power of Attorney" attempting to revoke Lender's power of sale in the Security Deed recorded January 31, 2011;

---

[3] The Court need not list all six transfers and name each intermediate holder, but all six assignments are attached to the Motion to Annul at exhibits C, J, and M through P. The Loan is also evidenced by a promissory note executed by Debtor in favor of Florida Capital, which was endorsed by Florida Capital to the initial transferee of the Security Deed, which thereafter endorsed the promissory note in blank. [*See* Motion to Annul, Ex. A.]

- "Substitution of Trustee" attempting to assign the Security Deed recorded January 31, 2011;

- "Quitclaim Deed" purporting to transfer the Property to the Evans Family Trust, of which Debtor is purportedly trustee, without the authority of Lender recorded February 2, 2011;

- "Discharge of Deed to Secure Debt" attempting to cancel, release, and discharge the Security Deed without the authority of Lender recorded February 25, 2011;

- "Deed to Secure Debt" in favor of the Kempshot Family Trust (the "Second Security Deed") to secure an alleged loan of $200,000 recorded May 31, 2011;

- "Assignment of Security Deed" purporting to assign the Second Security Deed to the Morgan Trust Fund recorded June 21, 2011;

- "Certificate of Trust" purporting to authenticate the Morgan Trust Fund and naming Debtor as the trustee recorded June 22, 2011;

- "Limited Power of Attorney" appointing John Shiloh Johnson as attorney-in-fact for the Morgan Trust Fund recorded October 4, 2011; and

- "Deed Under Power" stating that the Morgan Trust Fund purchased the Property at foreclosure free and clear of all liens recorded October 14, 2011.

[*Id.*] The Superior Court ordered that the Junk Filings "have no legal effect and are void" and further enjoined and restrained Debtor, among others, from recording any further documents pertaining to the Property unless first authorized by order from the Superior Court. [*Id.*]

Undeterred by the Superior Court's 2015 Order, Debtor continued to record documents in the Rockdale County real estate records pertaining to the Property, causing Lender to file a second lawsuit against Debtor in the Superior Court in 2018. The Superior Court first entered an order dated February 18, 2019, finding Debtor in contempt for violating the 2015 Order at least four times by recording four deeds

5

purporting to convey title to the Property after entry of the 2015 Order. The Superior Court ordered Debtor to be incarcerated until she paid $4,000 into the Superior Court's registry and again enjoined Debtor "from executing, recording, or causing to be recorded any additional documents in the real property records of Rockdale County, Georgia which in any way reference or purport to affect [the] title to the Property without first obtaining an Order from this Court." [Doc. No. 14-6, Ex. F.]

The second lawsuit culminated in an order granting Lender's motion for summary judgment dated May 10, 2021 (the "2021 Order"). [Doc. No. 14-12, Ex. L.] The 2021 Order detailed more Junk Filings related to the Property both before and after entry of the 2015 Order:

- Warranty Deed purporting to convey the Property from the Morgan Trust Fund to Nathaniel Washington recorded August 29, 2012;

- Joint Tenancy with Survivorship Warranty Deed purporting to convey the Property from Nathaniel Washington f/k/a John Shiloh Johnson to himself, Orvil Beckford, Jr., and Michael Brown recorded September 6, 2012;

- Warranty Deed purporting to convey the Property from Nathaniel Washington to Michael Brown and Orvil Beckford, Jr. recorded March 20, 2013;

- Warranty Deed purporting to convey the Property from Michael Brown and Orvil Beckford, Jr. to the Shiloh Trust Fund recorded March 5, 2015;

- Quit Claim Deed dated November 9, 2016, conveying the Property from the Shiloh Trust Fund to Debtor;

- Warranty Deed dated January 16, 2017, conveying the Property from Debtor to Debtor and Courtney Felice Haynes;

- Warranty Deed dated February 16, 2017, conveying the Property from Debtor and Courtney Felice Haynes to Debtor, Corey Robinson, and Kelsi M. Brown;

- Warranty Deed dated June 16, 2018 conveying the Property from Debtor, Corey Robinson, and Kelsi M. Brown to Debtor and Derrick D. Collier;

- "Georgia Assignment of Security Deed" forged by Debtor and purporting to assign the interest in the Security Deed from MERS, "as nominee for Rushmore Loan Management Services its successor and assigns" to "Guaranty Bank, its successor and assigns recorded February 2, 2018; and

- "Cancellation of Deed to Secure Debt" forged by Debtor and stating the Security Deed was last assigned to Rushmore Loan Management Services, LLC and that Rushmore purportedly attempted to cancel the Security Deed recorded March 6, 2018.

[*Id.* at pp. 4-6.] Altogether, Debtor caused 19 Junk Filings pertaining to the Property to be recorded in the real estate records over a period of seven years, at least two of which the Superior Court found to be forgeries by Debtor. [*Id.* at pp. 6-8.] It appears the Junk Filings finally stopped after Debtor was arrested and purged the contempt by paying $4,000 into the Superior Court's registry June 21, 2019. [*Id.* at p. 11.]

The 2021 Order again found that the "Security Deed is in full force and effect in a first priority lien position on the Property," that the Property remains encumbered by the Security Deed, that Debtor remains obligated according to the terms of the Security Deed, and any ownership interest of Debtor and Derrick Collier[4] are subject to the Security Deed. [*Id.* at p. 9.] The Superior Court further found that the plaintiff[5] was the current holder of the Security Deed and authorized to exercise

---

[4] Debtor and Derrick Collier were the last two transferees pursuant to the various deeds recorded, but it is not clear if any of the transfers are valid because they were either outside the chain of title or violated the 2015 Order.

[5] MTGLQ Investors, L.P. was the plaintiff and Lender at the time of the 2021 Order.

all rights and privileges afforded to the holder of the Security Deed. The Superior Court found that the outstanding amount owed on the Loan was $673,199.22. [*Id.*]

The Superior Court also found that Debtor prepared, drafted, and filed the "Georgia Assignment of Security Deed" and "Cancellation of Deed to Secure Debt" "as another bad faith attempt to forestall foreclosure proceedings against the Property." [*Id.* at 11.] The Superior Court further found that Debtor "continues to file junk filings in the Rockdale County land records in order to continue to reside at the Property without making any monthly mortgage payment due and owing on the Loan, as secured by the Security Deed, for almost eleven (11) years . . . ." [*Id.*] The Superior Court awarded plaintiff attorney's fees and costs in the amount of $30,583.96 pursuant to O.G.G.A. § 13-6-11, which allows for attorney's fees "where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense." [*Id.*]

Finally, the Superior Court ordered that any subsequent conveyance of the Property by Debtor "is declared null and void and has no legal force and effect on the priority of the Security Deed nor does any subsequent conveyance of the Property by [Debtor] effect Plaintiff's ability to enforce the terms and remedies under the Security Deed and remedies allowed by Georgia law." [*Id.* at p. 12]

### C. **Debtor's Bankruptcy History**

Debtor's delay campaign was not limited to filings in the real estate records. Concurrently with the Junk Filings, Debtor also launched a series of bad faith bankruptcy filings that abused the bankruptcy system to stop numerous foreclosures.

8

Debtor filed her first bankruptcy case, a chapter 13 case, January 3, 2011, a few weeks prior to the first Junk Filing. [*See* Case No. 11-50080-mhm.] The first case stopped a scheduled foreclosure sale and was dismissed in just over two months for failure to pay the filing fee. Debtor filed no schedules or plan, paid no funds into the case, and failed to attend the 341 meeting.

Debtor filed her second bankruptcy case, a chapter 13 case, May 2, 2011. [*See* Case No. 11-63285-mhm.] The second case again stopped a foreclosure sale, which was scheduled for the following day. Debtor filed no plan, made no plan payments, and failed to appear at the 341 meeting. Debtor filed a notice of intent to dismiss the case June 13, 2011, which stated Debtor intended to seek legal counsel. The Court dismissed the second case July 29, 2011, for Debtor's failure to make plan payments. Lender filed a proof of claim in the second case asserting an arrearage on the Loan of $56,938.48. [11-63285, Claim No. 4.]

Debtor filed her third bankruptcy case, this time a chapter 7 case, November 16, 2012. [*See* Case No. 12-78740-mhm.] Debtor again failed to pay the filing fee, failed to file schedules or a statement of financial affairs, and failed to appear at two scheduled 341 meetings. Debtor again filed a notice of intent to dismiss, again stating Debtor desired to seek legal counsel. The Court initially dismissed the third case January 17, 2013, for Debtor's failure to appear at the 341 meeting, but the Court reopened the case to enter a supplemental order of dismissal with a bar against refiling for 180 days from and after January 17, 2013. [Case No. 12-78740, Doc. No.

9

26.] The Court specifically found in the supplemental order that "Debtor's actions and omissions evidence bad faith and an attempt to abuse the bankruptcy system." [*Id*.]

Debtor filed her fourth bankruptcy case, a chapter 13 case, February 29, 2016. [*See* Case No. 16-53731-pmb.] The fourth case stopped another foreclosure sale scheduled the day after the petition date. Debtor failed to file a plan and failed to pay any funds into the case. Debtor filed yet another motion to voluntarily dismiss her case stating she intended to obtain counsel, and the Court dismissed the case the following day, April 7, 2016.

Debtor filed her fifth bankruptcy case, initially filed as a chapter 13 case, July 31, 2017. [*See* Case No. 17-63304-pmb.] The fifth case stopped another foreclosure sale scheduled the day after the petition. Debtor failed to file a plan or pay any funds into the case and moved to convert the case to chapter 7 less than two months after filing. The case converted, but Debtor again failed to attend the 341 meeting and again filed a notice of intent to dismiss the case voluntarily. The Court dismissed the fifth case November 17, 2017, for Debtor's failure to attend the 341 meeting.

Debtor filed her sixth bankruptcy case, a chapter 13 case, May 1, 2023. [*See* Case No. 23-54070-TJ23.] The sixth case stopped yet another foreclosure sale scheduled for the following day. Debtor again failed to file a plan, failed to pay any funds into the case, and failed to appear at the 341 meeting. The Court dismissed Debtor's sixth case June 16, 2023, for her failure to file information.

Debtor filed her seventh case, a chapter 13 case, July 31, 2023. [*See* Case No. 23-57273-TJ23.] The seventh case stopped another foreclosure sale scheduled for the

10

next day. The only case in which Debtor retained counsel, the seventh case proceeded much like all her other cases. She failed to file schedules, failed to file a plan, and failed to pay any funds into the case. The Court dismissed the seventh case less than a month after it was filed for Debtor's failure to file information.

### D. **Debtor's Current Case and Foreclosure**

Debtor filed the instant case, another chapter 13 case and Debtor's 8th overall since 2011, at 8:52 a.m. August 6, 2024 (the "Petition Date"). [*See* Doc. No. 1, Voluntary Petition hand stamped as filed in the Clerk of Court's office at 8:52 a.m., August 6, 2024.] Unlike 6 of Debtor's previous cases filed the day before a scheduled foreclosure, Debtor filed this case the same morning as a scheduled foreclosure sale to be conducted by Wilmington's counsel, McCalla Raymer, LLC ("McCalla").

Debtor's Response to the Motion to Annul asserts she "immediately" notified Lender's foreclosure counsel of the bankruptcy filing by fax, e-mail, and telephone call with Attorney Tomiya Lewis and refers to Exhibits D, E, and F in support. [Doc. No. 18 p. 5.] Debtor also references an "instantaneous official broadcast by the Bankruptcy Noticing Center (BNC)" and refers to Exhibit C. [*Id.*]

Exhibit C is a document that appears to have been generated by the Clerk of Court's office after Debtor's petition was docketed. It is titled as a Notice of Bankruptcy Case Filing and includes information pertaining to Debtor's current bankruptcy case, including the date (August 6, 2024), the exact time of filing (8:52 a.m.), the exact time of docketing (8:58 a.m.), the case number, and Debtor's name and address. [Doc. No. 18, Ex. C.] Nothing on Exhibit C shows or suggests that the

11

Court or the BNC served that document on anyone, and it is unclear what Debtor means by "instantaneous official broadcast by the Bankruptcy Noticing Center." The Court's official Notice of Chapter 13 Bankruptcy Case was not docketed until 4:14 PM August 6, 2024 [*See* Doc. No. 9], and the Certificate of Notice filed by the BNC at Doc. No. 10 shows that the Notice of Chapter 13 Bankruptcy Case was sent only to Debtor and Trustee by email at 8:20 p.m. August 6, 2024. The Court entered an Order at 3:45 p.m. August 6, 2024, requiring Debtor to file a list of creditors pursuant to Bankruptcy Rule 1007(a)(1) no later than August 31, 2024. [*See* Doc. No. 6.] That order states that Debtor's petition was not accompanied by a required list of creditors and that notice of the commencement of the bankruptcy case cannot be served until the list of creditors is filed. Thus, the record is clear that Wilmington could not have been served with notice of this bankruptcy case by the Court at any point on August 6, 2024.

Exhibit D is a document that appears to have been prepared by Debtor. It is dated August 6, 2024, and states it is to the attention of Tomiya Lewis of McCalla Raymer, Leibert, Pierce, LLC. It further states that Debtor filed a bankruptcy and that the filed petition is attached. The document states "via email" on its face, but it does not contain any apparent email address or phone number of Tomiya Lewis or anyone other than Debtor's own email address in the document heading. It does not appear to be an email as it includes no "To" or "From" email addresses, subject line, time, or any other information one normally associates with an email. Nor does it contain any information indicating when or how the document might have been

emailed or faxed or otherwise sent to anyone. Further, the document does not include the bankruptcy case number, nor is the stamped-filed petition attached to the document. [*See* Doc. No. 18, Ex. D.]

Exhibit E is a similar document addressed to Tomiya Lewis at McCalla Raymer, but it is dated August 5, 2024 (the day before the Petition Date) and references state court litigation initiated by Debtor against Wilmington. It does not reference a bankruptcy filing at all. Further, like Exhibit D, it does not contain any information indicating when or how the document might have been emailed or faxed or otherwise sent to anyone. [*See* Doc. No. 18, Ex. E.]

Exhibit F appears to be the exact same document as Exhibit E and likewise contains no reference to the bankruptcy case or contain any transmission information. Attached to Exhibit F, however, appear to be two affidavits of service of a summons and complaint. It appears these affidavits, which are dated August 1, 2024 (i.e., prepetition), relate to state court proceedings Debtor may have filed against Wilmington. [*See* Doc. No. 18, Ex. E.] Exhibits E and F could not have provided notice to Wilmington of the Debtor's bankruptcy case.

Debtor's Addendum asserts she filed the "petition at 8:52 a.m. on August 6, 2024, and it was recorded and broadcast by the Bankruptcy Noticing Center at 8:58 a.m." [Doc. No. 33 ¶ 1.] Again, the Court does not understand what Debtor means by "broadcast" by the BNC. Debtor then asserts that "shortly thereafter, I telephoned McCalla Raymer and spoke directly with attorney Tomiya Lewis, who I informed that I had filed the Bankruptcy Petition. Thereafter at precisely 10:12 a.m. I emailed the

13

Bankruptcy Certificate to McCalla Raymer, and Faxed the said document to the Law Firm at 10:15 a.m." [*Id*. at ¶ 2.] Debtor again attaches the "Notice of Bankruptcy Case Filing" attached as Exhibit C to Debtor's Response, but Debtor does not provide any other evidence or documentation showing that she emailed or faxed any notice to McCalla at 10:12 a.m. or 10:15 a.m. [*Id*.]

At the hearing, counsel for Wilmington, an attorney at McCalla, stated that Debtor's "email came in at 9:43 a.m.," 15 minutes before the scheduled sale at 10:00 a.m. He further stated that McCalla had 229 foreclosure sales scheduled for August, 2024, with 51 foreclosure sales completed. He stated that 14 sales were canceled in response to bankruptcy filings within 24 hours of the scheduled foreclosure. He further argued that his firm likely would have analyzed whether a stay was in place given Debtor's history once being made aware of the filing. He further argued that the timing of the filing and notices provided to McCalla was likely strategic by Debtor.

Debtor repeated at the hearing her statements in her Response and Addendum that she called McCalla and spoke with attorney Lewis "shortly" after filing the bankruptcy, that she emailed a notice at 10:12 a.m., and she faxed a notice at 10:15 a.m.

McCalla proceeded with the foreclosure sale and cried the sale at 10:32 a.m. August 6, 2024. A third-party buyer, Legacy of Tuskegee, LLC, purchased the property for $336,000 (the "Foreclosure Sale"). [Doc. No. 14, ¶ 2.] Wilmington has not taken steps to conclude the Foreclosure Sale or record the deed under power.

Debtor asserts in her responses and at the hearing that Derrick Shipman, the owner of the purchaser of the Property at foreclosure, sent her notices to vacate the Property dated August 10, 2024. Debtor attached a document dated August 10, 2024 at Exhibit A to her Response titled "10 Day Notice to Vacate." The document appears to be a notice from Derrick Shipman that his company purchased the Property at foreclosure and the letter serves as formal notice and demand for possession within 10 days. The document is unsigned. [*See* Doc. No. 29, Ex. A.]

Wilmington filed the Motion to Annul August 14, 2024. As of the Petition Date, Debtor is 177-payments delinquent on the Loan with arrears totaling $443,948.46. The principal balance is $336,587.07, and the total balance is $780,535.53. [Doc. No. 14, Ex. A.] Debtor scheduled the value of the Property at $708,232. [Doc. Nos 24 and 30.] In Debtor's most recent previous case in which she filed schedules, Debtor scheduled the value of the Property at $255,200. [Case No. 17-63304.]

Debtor filed a Certificate of Credit Counseling that shows she obtained credit counseling August 20, 2024—i.e., after the Petition Date. [Doc. No. 21.] Debtor filed credit counseling certificates in each of her previous cases, although in three cases she obtained the counseling post-petition. [*See* Case Nos. 11-63285, 16-53731, and 23-54070.]

Debtor's plan, the first plan filed by Debtor in any of her chapter 13 cases, contains numerous incomplete sections. [Doc. No. 27.] For example, Debtor fails to elect an applicable commitment period in § 2.1 and fails to elect any treatment for unsecured claims in § 5.1. The proposed plan payment is $1,226 per month, and the

only claim treated under the plan is the Loan in § 3.3, which provides for claims to be paid in full under the plan. The plan estimates Wilmington's claim on the Loan at $708,232 and proposes to pay $1,200 per month at 6% interest. The minimum number of months required to pay $708,232 with $1,200 per month is 591, assuming no interest accrues.

Debtor's schedule I shows combined monthly income of $4,393. Debtor's schedule J shows monthly expenses of $4,992, including $2,246 per month for mortgage payments. [Doc Nos. 18 and 24.]

Debtor has not challenged any of the factual assertions discussed above relating to her Loan history, the Superior Court cases and orders, the Junk Filings, her history of bankruptcy filings, or the Loan balance or arrearage. Her only arguments in her papers and at the Hearing are that she provided timely notice of this case to McCalla, that the Foreclosure Sale violated the automatic stay, that Derrick Shipman violated the stay by posting notices at the Property, and that Wilmington is not authorized to conduct business in Georgia because it is not registered with the Georgia Secretary of State.

## CONCLUSIONS OF LAW

The Court first considers Wilmington's Motion to Annul.

### A. The Automatic Stay Will Be Annulled as of the Petition Date

Wilmington requests that the automatic stay under § 362(a) "be lifted effective as of the date this case was filed and that the foreclosure sale conducted August 6,

2024, be deemed valid to the extent it is otherwise valid under Georgia law." Section 362(d) provides:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
>
>> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest.

The Eleventh Circuit has ruled that bankruptcy courts may annul the automatic stay and validate acts that would otherwise violate the stay. *In re Albany Partners, Ltd.,* 749 F.2d 670, 675 (11th Cir.1984) ("§ 362(d) permits bankruptcy courts, in appropriately *limited* circumstances, to grant retroactive relief from the automatic stay"). Other circuit courts agree. *See In re Myers*, 491 F.3d 120 (3d Cir.2007) ("We reaffirm that actions in violation of the stay are void but retroactively ratifiable if the stay is annulled"); *In re Soares*, 107 F.3d 969, 977 (1st Cir.1997) ("a power of annulment is meaningful only if the court may thereby validate actions taken *before* the date on which the court rules" and "section 362(d) authorizes retroactive relief from the automatic stay"); *In re Nat'l Env't Waste Corp.*, 129 F.3d 1052 (9th Cir.1997) ("section 362(d) 'gives the bankruptcy court wide latitude in crafting relief from the automatic stay, including the power to grant retroactive relief from the stay.'" (citation omitted)); *Easley v. Pettibone Mich. Corp.*, 990 F.2d 905, 910 (6th Cir. 1993) (power to annul under 362(d) "permits the order to operate retroactively, thus validating actions taken by a party at a time when he was unaware of the stay." (citations omitted)).

Neither the Eleventh Circuit nor other circuit court opinions offer a specific test to analyze whether annulment is appropriate in any given case. Instead, each case is "sui generis, and must be judged accordingly." *In re Soares*, 107 F.3d at 977; *see also In re Nat'l Env't Waste Corp.*, 129 F.3d at 1055 ("we have engaged in a case by case analysis"). The Eleventh Circuit is clear, however, that annulment is appropriate only in limited circumstances, and "the important congressional policy behind the automatic stay demands that courts be especially hesitant to validate acts committed during the pendency of the stay." *In re Albany Partners,* 749 F.2d at 675; *see also In re Soares*, 107 F.3d at 977 (1st Cir.1997) ("a rarely dispensed remedy like retroactive relief from the automatic stay must rest on a set of facts that is both unusual and unusually compelling").

Although courts often focus on two factors—either the creditor's lack of knowledge of the automatic stay or a debtor's bad faith or inequitable conduct—courts do not consider those factors dispositive or exhaustive. *See In re Soares*, 107 F.3d at 976 ("These examples—a creditor's lack of notice or a debtor's bad faith—clearly do not exhaust the possibilities."); *In re Nat'l Env't Waste Corp.*, 129 F.3d at 1055 ("we have never held these two factors to be dispositive"); *In re Myers*, 491 F.3d at 129 (giving bankruptcy courts wide latitude to balance equities and finding creditors knowledge of stay not to be dispositive where debtor engages in bad faith). Additional factors that courts consider include:

1. Number of bankruptcy filings;

2. Whether, in a repeat filing case, the circumstances indicate an intention to delay and hinder creditors;

3. A weighing of the extent of prejudice to creditors or third parties if the stay relief is not made retroactive, including whether harm exists to a bona fide purchaser;

4. The debtor's overall good faith (totality of circumstances test);

5. Whether creditors knew of the stay but nonetheless took action, thus compounding the problem;

6. Whether the debtor has complied, and is otherwise complying, with the Bankruptcy Code and Rules;

7. The relative ease of restoring the parties to the *status quo ante*;

8. The costs of annulment to debtors and creditors;

9. How quickly creditors moved for annulment, or how quickly debtors moved to set aside the sale or violative conduct;

10. Whether, after learning of the bankruptcy, creditors proceeded to take steps in continued violation of the stay, or whether they moved expeditiously to gain relief;

11. Whether annulment of the stay will cause irreparable injury to the debtor; and

12. Whether stay relief will promote judicial economy or other efficiencies.

*In re Cruz*, 516 B.R. 594, 603-04 (B.A.P. 9th Cir. 2014) (cleaned up). "These factors merely present a framework for analysis and '[i]n any given case, one factor may so outweigh the others as to be dispositive.'" *Id.* "Consistent with § 362(g), 'the creditor seeking retroactive relief must first show the presence of circumstances warranting annulment of the stay, and the debtor then bears the ultimate burden of proving that the request for retroactive relief from the stay should be denied.'" *Matter of Patel*, 642 B.R. 187, 198 (Bankr. N.D. Ga. 2022) (citing *In re Schumann*, 546B.R. 223, 229–30 (Bankr. D.N.M. 2016).

In reviewing the above authority and the facts of this case, the Court finds annulment of the stay to be appropriate. This case is truly extraordinary. Debtor's

sustained and patent abuse of the bankruptcy system over the course of 13 years, a brazen campaign of Junk Filings in the real estate records, and the failure to pay a single mortgage payment for 15 years, demonstrates one of the worst cases of bad faith the above-signed judge has seen in his time on the bench. The Court need not belabor the point as the facts speak for themselves, and the Court will simply analyze the *In re Cruz* factors in turn.

1. <u>Number of cases</u>: this is Debtor's 8th case in 13 years. Although the Court has seen other debtors with more cases in the same span, 8 cases is excessive for any time span. This factor weighs heavily in favor of annulment.

2. <u>Circumstances indicating an intention to delay and hinder creditors</u>: Debtor's history shows a clear pattern of filing bankruptcy for the sole purpose of delaying and hindering foreclosure. All but one of Debtor's eight cases were filed on the eve of foreclosure or the day of foreclosure. Debtor made no effort to prosecute any of her previous cases. Debtor never filed a single plan or made a single plan payment in the 7 previous cases. Every case was dismissed within a few weeks of filing, several voluntarily by Debtor. Debtor has made no mortgage payments in 15 years, a truly remarkable number. Debtor's mortgage arrearage is over $440,000, another remarkable number. Debtor's plan in this case, the only case in which she filed a plan, is hopelessly infeasible and patently incompatible with the

Bankruptcy Code.[6] Even if the Court ignores the Junk Filings in the real estate records and the multiple orders by the Superior Court, the facts show a clear and pervasive intention to delay and hinder Debtor's creditors. This factor weighs heavily in favor of annulment.

3. <u>A weighing of the extent of prejudice to creditors or third parties if the stay relief is not made retroactive, including whether harm exists to a bona fide purchaser</u>: If stay relief is not made retroactive, Wilmington will have to refund the purchase price of the Foreclosure Sale and undoubtedly go through yet another foreclosure process, which will only serve to provide Debtor with more time to contrive ways to hinder and delay Wilmington's efforts to recover on its collateral. This case also involves a third-party buyer.[7] This factor weighs in favor of annulment.

---

[6] In addition to numerous deficiencies that arguably could be cured, such as providing no treatment to unsecured claims and failing to elect an applicable commitment period, Debtor's proposed treatment of the Loan is both patently defective and uncurable based on Debtor's schedules. The plan proposes to pay the Loan in full in the amount of $708,232 with 6% interest at a rate of $1,200 per month. The required term to pay $708,232 in monthly installments of $1,200 is over 49 years. The longest possible plan term under the Bankruptcy Code is 5 years. 11 U.S.C. § 1322(d). To pay the Loan in full in 5 years at Debtor's proposed amount of $708,232 (which is significantly less than the $780,535 balance asserted by Wilmington), the minimum payment to Wilmington is at least $11,803 per month, not including any interest. Debtor's Schedule I shows gross monthly income of $4,393. Debtor's schedule J shows monthly expenses of $4,992, leaving no room for Debtor's proposed plan payment of $1,222, much less a plan payment large enough to pay the Loan over 5 years. Even if one assumes Debtor could amend the plan to treat the Loan under § 3.1 and make regular payments while curing the arrears, the arrears are over $443,000. Paying $443,000 over 5 years requires a minimum payment of $7,383. Further, there is no equity in the Property, even if one accepts Debtor's scheduled value of $708,000 (which appears to be contrived for the purpose of matching Debtor's estimated Loan balance). Even if the Court were to assume that Debtor could propose a plan in good faith, the information in the record demonstrates there is no feasible scenario in which Debtor could pay the Loan over the course of 5 years in accordance with the Bankruptcy Code.

[7] After the Hearing, the Court received an email purportedly from Derrick Shipman, the alleged owner of the purchaser of the Property at the Foreclosure Sale, requesting that the Court not validate the Foreclosure Sale. The Court has docketed the email at Doc. 46, but the Court has not considered the substance of the email in reaching this opinion given that neither Derrick Shipman nor any other person representing the purchaser has appeared of record in this case or filed a proper response to the

4. <u>Debtor's bad faith, totality of the circumstances</u>: Debtor's conduct demonstrates a clear and pervasive pattern of bad faith in this case, her previous cases, and in her other dealings with the Lender over the past 15 years. Debtor clearly has no intention of ever paying Wilmington or any other Lender on the Loan and intends only to delay foreclosure by any means necessary. This factor weighs heavily in favor of annulment.

5. <u>Whether creditors knew of the stay but nonetheless took action, thus compounding the problem</u>: This is the only factor that arguably weighs against annulling the stay. The evidence is unclear regarding when McCalla was actually aware of the bankruptcy filing. Debtor asserts she called Tomiya Lewis soon after the case was filed at 8:52, but it is not clear what time she called, and Debtor's credibility is less than impeccable. Debtor also initially asserted that she "immediately" emailed and faxed notice to McCalla, but later she asserted that she sent an email at 10:12 and a fax at 10:15, over an hour after the filing and mere minutes before the Foreclosure Sale occurred. If the email and fax times were the only evidence of notice, the Court would easily conclude that such notice was not sufficient to alert McCalla to the filing in time to stop the Foreclosure Sale given the practical mechanics of foreclosure days at a firm such as McCalla, which was handling hundreds of foreclosures that day. McCalla's attorney

---

Motion to Annul, and the Court expresses no opinion on the validity of the Foreclosure Sale for any reason other than annulment of the automatic stay under the Bankruptcy Code.

stated at the hearing, however, that it received an email at 9:43 a.m. It is not clear what email this would have been or who received it. What is clear is that Debtor waited as long as possible to file a bankruptcy and then gave McCalla, at best, an hour warning, and possibly significantly less than an hour notice, and the Court cannot conclude with any certainty based on the evidence before it that "creditors knew of the stay but nonetheless took action." The fifth factor, all told, does not weigh in Wilmington's favor.

6. <u>Whether the debtor has complied, and is otherwise complying, with the Bankruptcy Code and Rules</u>. As will be discussed below, Debtor was not eligible to be a debtor because she failed to obtain credit counseling prior to filing this case as required by § 109(h), and this case will be dismissed as part of this Order. Debtor's plan, the first plan she has ever filed, is incomplete, patently incompatible with the Bankruptcy Code, and demonstrably infeasible.[8] What's more, since the September 10th Hearing, Trustee filed a Motion to Dismiss alleging that Debtor has failed to make plan payments, provide proof of post-petition mortgage payments, provide proof of post-petition home-owner's association payments, and more. (Doc. No. 42).[9] This factor weighs heavily in favor of annulment.

7. <u>The relative ease of restoring the parties to the *status quo ante*</u>: Wilmington

---

[8] *See* note 6, *supra*.

[9] Although Debtor filed a response to Trustee's motion to dismiss, she does not dispute that she has not made plan payments, post-petition mortgage payments, or HOA payments. Instead, she appears to argue, incorrectly, that she is not required to make any such payments until a plan is confirmed. [*See* Doc. No. 44 ¶¶ 3-6.]

would be required to refund the sale price, but otherwise this factor does not appear to weigh significantly in either direction.

8. <u>The costs of annulment to debtors and creditors</u>: It is unclear how this factor would weigh into the Court's analysis. The Court has no evidence or argument on any cost associated with annulment.

9. <u>How quickly creditors moved for annulment, or how quickly debtors moved to set aside the sale or violative conduct</u>: Wilmington moved for stay relief eight days after the case was filed. Debtor timely opposed the Motion to Annul. This factor is neutral.

10. <u>Whether, after learning of the bankruptcy, creditors proceeded to take steps in continued violation of the stay, or whether they moved expeditiously to gain relief</u>: Wilmington took no steps to record a deed under power or otherwise finalize the Foreclosure Sale and expeditiously moved for stay relief. This factor weighs in favor of annulment.

11. <u>Whether annulment of the stay will cause irreparable injury to the debtor</u>: The Court finds no irreparable injury to Debtor. Wilmington is entitled to pursue foreclosure and, as discussed below, the Court will find that the Debtor engaged in a scheme to delay, defraud, and hinder Wilmington such that the automatic stay will not go into effect in a future case. This factor weighs in favor of annulment.

12. <u>Whether stay relief will promote judicial economy or other efficiencies</u>. Stay relief will promote judicial economy because any further delay in

foreclosure would simply allow Debtor to engage in further baseless delay tactics in both this Court and state court. This factor weighs heavily in favor of annulment.

In considering the factors and the extraordinary circumstances of this case, the Court easily concludes that annulment of the stay is appropriate, even applying the strictest of tests articulated by various courts. Debtor's arguments in opposition to annulment are that the Court does not have jurisdiction over her Property, that the Court cannot validate an act in violation of the stay, that McCalla was aware of the stay at the time of the Foreclosure Sale, that the purchaser at the Foreclosure Sale has violated the automatic stay, that Wilmington does not have standing to request stay relief because it is not registered to do business in Georgia, and that she has not filed her previous cases in bad faith. The Court has concluded above that it has jurisdiction over this matter and that it has authority to annul the stay under § 362(d). The Court has considered Debtor's bad faith and McCalla's possible knowledge of the stay in its analysis above. The Court rejects Debtor's other arguments as either incorrect[10] or irrelevant.[11] The Court will therefore annul the

---

[10] Debtor argues in various places in her papers and at the Hearing that Wilmington cannot provide a certificate of authority to transact business in Georgia because it is not registered with the secretary of state or banking and finance department. Therefore, Debtor argues, the assignment of the Security Deed to Wilmington is invalid and Wilmington cannot maintain any lawsuits in the state, citing to O.C.G.A. § 14-2-1501. Assuming Wilmington is not registered, the argument is without merit because Georgia law specifically provides that "[s]ecuring or collecting debts or enforcing any rights in property securing the same" "*do[es] not constitute transacting business* within the meaning of [O.C.G.A. § 14-2-1501(a)]. *See* O.C.G.A. § 14-2-1501(b)(8); *see also El v. Platinum Home Mortg. Servs., Inc.*, Case No. 1:10-CCV-2066-CC-JFK, 2011 WL 13185748 at *23 (N.D. Ga. Apr. 1, 2011) (dispossessory actions fall under the statutory exception).

[11] Whether the purchaser violated the stay after the Foreclosure Sale is not properly before the Court, and the Court does not consider the purchaser's acts relevant to Debtor's bad faith and Wilmington's actions.

stay, validate the Foreclosure Sale, allow Wilmington to take all steps necessary to finalize the sale, and waive the 14-day stay pursuant to Bankruptcy Rule 4001(a)(3).

**B. This Case Is Part of a Scheme to Delay, Hinder, or Defraud Wilmington Pursuant to § 362(d)(4)**

In addition to annulment of the stay, Wilmington requests a finding that this case was filed as part of a scheme to delay, hinder, or defraud it as contemplated in § 362(d)(4). That section provides for stay relief:

> (4) with respect to a stay of an act against real property under subsection (a), by a creditor whose claim is secured by an interest in such real property, if the court finds that the filing of the petition was part of a scheme to delay, hinder, or defraud creditors that involved either—
>
> (A) transfer of all or part ownership of, or other interest in, such real property without the consent of the secured creditor or court approval; or
>
> (B) multiple bankruptcy filings affecting such real property.

11 U.S.C. § 362(d)(4).

The Court finds that this case was filed as part of a scheme to delay, hinder, or defraud Wilmington that involves both transfers of the Property without consent of Lender and without court approval and multiple bankruptcy filings. As discussed above, Debtor has been engaged in a scheme to hinder, delay, and defraud her Lender since 2011. The Superior Court orders establish that Debtor has attempted numerous transfers of the Property without consent of Lender or a court, and the Debtor's bankruptcy record establishes multiple filings made for no reason other than to stop scheduled foreclosures of the Property. In the event the Foreclosure Sale is not

26

completed for any reason, this Order shall constitute an order entered under §
362(d)(4).

### C. **Debtor Did Not Comply with Section 109(h)(1) and Is Not Eligible to Be a Debtor**

Bankruptcy Code § 109(h)(1) provides:

> Subject to paragraphs (2) and (3), and notwithstanding any other provision of this section other than paragraph (4) of this subsection, an individual may not be a debtor under this title unless such individual has, during the 180-day period ending on the date of filing of the petition by such individual, received from an approved nonprofit budget and credit counseling agency described in section 111(a) an individual or group briefing (including a briefing conducted by telephone or on the Internet) that outlined the opportunities for available credit counseling and assisted such individual in performing a related budget analysis.

11 U.S.C. § 109(h). To be eligible to be a debtor, the Debtor must have obtained the required credit counseling during the 180-day period ending on the Petition Date or satisfy one of the exceptions under paragraphs (2), (3), or (4). There is no dispute here that Debtor did not obtain credit counseling in the time required by § 109(h)(1), as the Credit Counseling Certificate shows that Debtor obtained the required credit counseling on August 20, 2024, well after the Petition Date of August 6, 2024. Although Debtor filed the Motion to Waive, which nominally requests a waiver of the requirements under § 109(h), the Motion to Waive does not attempt to satisfy any of the requirements for a waiver under § 109(h) (2), (3), or (4).

Section 109(h)(2) applies only to debtors who live in a district where the United States Trustee has determined that approved nonprofit budget and credit counseling agencies are not able to provide adequate services. This section does not apply to the Northern District of Georgia, where Debtor resides.

Section 109(h)(4) applies only with respect to a debtor that is unable to complete credit counseling due to incapacity, disability, or active military duty in a military combat zone. Debtor is neither incapacitated, disabled, nor in active military duty, nor has she argued that any of these circumstances apply to her.

Section 109(h)(3) lists the only other statutory exception and provides:

> the requirement [to obtain credit counseling] shall not apply with respect to a debtor who submits to the court a certification that—
>
> (i)    describes exigent circumstances that merit a waiver of the requirements [of obtaining credit counseling];
>
> (ii)    states that the debtor requested credit counseling services from an approved nonprofit budget and credit counseling agency, but was unable to obtain the services . . . during the 7-day period beginning on the date on which the debtor made that request; and
>
> (iii)    is satisfactory to the court.

11 U.S.C. § 109(h)(3).

The Motion to Waive does not attempt to describe any exigent circumstances, incapacity, disability, or any other circumstance meriting a waiver. Instead, Debtor argues only that Wilmington has no standing to file lawsuits in Georgia because it is not registered to do business in the state. Even if that was true,[12] that has no bearing on Debtor's eligibility to be a debtor for failure to obtain pre-petition credit counseling. Debtor has not attempted to establish any basis for which the Court could grant a waiver of the credit counseling certificate. Therefore, the Court finds Debtor ineligible to be a debtor.

---

[12] It is not true. *See* note 10, *supra*.

Wilmington argued in its Memorandum, filed the day before the Hearing, that the proper remedy for failure to obtain credit counseling is to strike Debtor's petition instead of simply dismissing the case. The Court declines to provide such a remedy because the Motion to Dismiss was filed by Trustee, not Wilmington, and Trustee requested only that the case be dismissed. Wilmington never requested that the petition be struck prior to filing its Memorandum. The Court denied Debtor's Motion to Continue in which she requested time to respond to the Memorandum, and the Court will not consider any new arguments raised by Wilmington in the Memorandum.

## CONCLUSION AND ORDER

For the foregoing reasons,

IT IS ORDERED that the Motion to Annul is GRANTED. The automatic stay is annulled retroactive to the Petition Date to the extent necessary to validate the Foreclosure Sale and to allow Wilmington to take all steps necessary to complete the Foreclosure Sale, including recording any deed under power, or otherwise exercise its remedies pursuant to the Security Deed.

IT IS FURTHER ORDERED that this Order shall be effective immediately notwithstanding any stay under Bankruptcy Rule 4001 or other rule or statute.

IT IS FURTHER ORDERED that this Order shall constitute an Order finding this case was filed as part of a scheme to delay, hinder, or defraud Wilmington with respect to the Property as contemplated in 11 U.S.C. § 362(d)(4). If recorded in compliance with applicable state laws governing notices of interests or liens in real

property, this Order entered under paragraph (4) shall be binding in any other case under the Bankruptcy Code purporting to affect the Property filed not later than 2 years after the date of the entry of this Order.

IT IS FURTHER ORDERED that the Motion to Continue is DENIED for the reasons stated on the record at the Hearing.

IT IS FURTHER ORDERED that the Motion to Waive is DENIED.

IT IS FURTHER ORDERED that the Motion to Dismiss is GRANTED. This case is DISMISSED.

The Clerk's office is directed to serve a copy of this Order on Debtor, counsel for Wilmington, the Chapter 13 Trustee, the United States Trustee, and all parties on the mailing matrix.

**END OF DOCUMENT**